I. DEAN ARNOLD *et al.*, Plaintiffs-Appellees, v. BABCOCK & WILCOX COMPANY, Defendant-Appellant.

Second District    Nos. 2—86—0085, 2—86—0258 cons.

Opinion filed April 22, 1987.

Henry J. Close, of Connolly, Oliver, Close & Worden, and William A. Ziegler, of Sullivan & Cromwell, both of Rockford, for appellant.

Elizabeth C. Henriksen and Frederick F. Kalivoda, both of Kalivoda & Shelton, of Rockford, for appellees.

JUSTICE DUNN delivered the opinion of the court:

Plaintiffs are 25 former salaried employees of defendant, Babcock & Wilcox Company (B & W), at its Automated Machine Division (AMD) facilities in Rockford, Illinois. In June 1982, defendant sold the AMD, at which time plaintiffs all became employees of the purchaser. At that time, defendant had in effect a policy regarding termination benefits known as policy and procedure No. 1414-A1.

Plaintiffs brought this action to recover termination allowance and pay in lieu of notice of termination allegedly due them under the policy. The complaint alleged breach of contract and was amended to allege violations of the Illinois Wage Payment and Collection Act (Ill. Rev. Stat. 1981, ch. 48, par. 39m—2) and the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. sec. 1001 et seq. (1982)). After a bench trial, the court found that the policy in question was governed by ERISA. The court also found that defendant was arbitrary and capricious in denying plaintiffs' requested benefits and awarded termination allowance, pay in lieu of notice of termination, and attorney fees. We reverse.

Defendant operated the Rockford facility until June 18, 1982, when defendant sold the plant, along with the rest of the AMD, to Acme Precision Products, Inc. Plaintiffs were notified of the sale by a memorandum posted by Acme on June 17, 1982. The memo informed plaintiffs that on June 18 they would become salaried employees of Acme and that wages and benefits were to continue in force, but that Acme was considering the need to make some changes in benefits. Subsequently, Acme eliminated severance benefits and a thrift incentive plan.

At the time of the sale, defendant's policy and procedure No.

1414-A1 regarding termination benefits for salaried employees provided as follows:

"PURPOSE

To provide a guide for compensating permanently terminated salaried employees.

POLICY

Permanently terminated salaried employees, under certain circumstances, will be compensated to assist them financially during the re-employment adjustment period, provided termination is made by management through no fault of the employees.

Any exceptions to the termination allowances in this policy must be approved by the Division Head and the Vice President of Employee Relations.

\* \* \*

GENERAL

Eligibility

Full-time salaried employees whose services are permanently terminated by the Company and who have either

a. One or more years of company service (if over 45 years of age), or

b. Five or more years of company service (regardless of age) are eligible under the following conditions:

1. Elimination of previously required services, due to consolidation of departments, mergers, abandonment of plants and offices, technological changes and declining business activity. No allowance may be paid where employee declines to accept transfer to a *reasonably* comparable position.

\* \* \*

Limitations

1. Termination Allowances are not payable:

\* \* \*

B. Under the following types of separation:

1. Temporary layoff where it is likely the employee will be offered re-employment

2. Military service

3. Retirement where the employee is immediately eligible under the Employee Retirement Plan

4. Discharge for proper cause

5. Quit or resignation

6. Death

\* \* \*

Termination Notice or Pay in Lieu Thereof

Employees with one or more years of company service shall be given a minimum of two weeks' notice or pay in lieu thereof.

Whenever practical, additional notice should be provided to enable the affected employee to make a satisfactory readjustment. Pay in lieu of notice, where given, shall be in addition to any termination allowance the employee may receive.

* * *

Responsibility

Request for payments under this guide must be in writing and approved by those responsible for authorizing the hiring of new employees and making salary adjustments for present employees. Final approval is limited to the Division Head."

The amount each employee was entitled to was to be calculated according to a schedule attached to the policy.

The policy was part of a three-volume manual issued to division heads. Copies of the manual were kept in the plant manager's office and the personnel department. Booklets distributed to employees describing benefits did not refer to termination allowance or pay in lieu of notice of termination. Plaintiffs, however, were aware that previously terminated employees had received severance pay. Some of the plaintiffs were also familiar with the policy through their supervisory duties, and the policy was available for inspection in the personnel department to those who asked to see it.

In April 1982, B & W management conducted a series of meetings to inform employees of the status of efforts to sell the Rockford facility. Defendant was represented by Calvin Linn, Rockford general manager, and Henry Auricchio, corporate director of industrial relations. The parties dispute what was said by Auricchio at the meetings. Plaintiffs claim that Auricchio promised that they would have a choice of taking employment with the purchaser with full seniority or being laid off by B & W, taking any B & W benefits to which they were entitled, but also taking the chance they would not be rehired by the purchaser. Plaintiffs also claim that Auricchio promised they would have two weeks to decide.

Defendant, on the other hand, contends that no such promises were made. Auricchio testified that at the time of the meetings, he was in no position to promise continued employment with a purchaser since no sale agreement had been reached. Furthermore, the only mention of a two-week option period was in regard to allowing employees who qualified for early retirement to decide whether to retire under defendant's pension plan or the purchaser's. Defendant says no

promises were made regarding termination benefits.

After the sale, most of the plaintiffs wrote defendant's parent corporation, McDermott Inc., asking whether they would have the option they believed they were promised. Defendant's retirement and pension board responded that plaintiffs were not terminated by B & W and that plaintiffs were not entitled to termination allowance because they had continued in a reasonably comparable position with Acme.

Since the sale of the Rockford facility to Acme, all plaintiffs have left the employ of Acme. Many were laid off when the projects on which they were working at the time of the sale were completed. Several others quit due to poor prospects with Acme. No orders for new machine tools were received by Acme after the sale, and Acme closed the Rockford plant in the fall of 1983. There was testimony at trial that in 1982 the machine tool industry was depressed and that unemployment rates in Rockford were as high as 22%, but there was also testimony that Acme actively sought new business after the sale.

Finally, when B & W sold its Rockford facilities, it also sold the rest of the AMD, consisting of plants in Rochester, Michigan, and Greer, South Carolina. Policy and procedure No. 1414-A1 was also in force at those facilities, and in neither case did defendant pay a termination allowance to salaried employees who were immediately employed in their same positions by Acme. The same was also true at three other B & W facilities sold in 1981.

The trial court, in an unsigned memorandum which was made part of the record, noted that the parties agree that ERISA is applicable to this case. Indeed, both parties have stated in their briefs that the policy in question is an "employee welfare benefit plan" within the meaning of ERISA. Furthermore, the parties agree that, under ERISA, the issue to be decided is whether defendant was arbitrary and capricious in interpreting policy and procedure No. 1414-A1 so as to deny plaintiffs termination allowance and pay in lieu of notice of termination.

■ The parties' agreement is well founded. Under ERISA, an "employee welfare benefit plan" is broadly defined to include:

"[A]ny plan, fund, or program which was *** established or maintained by an employer *** to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) *** unemployment, or vacation benefits, *** or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions)." (29 U.S.C.

sec. 1002(1) (1982).)

Section 186(c) specifically mentions severance benefits. Department of Labor regulations provide that the effect of citing to section 186(c) is "to include within the definition of 'welfare plan' those plans which provide holiday and severance benefits, and benefits which are similar (for example, benefits which are in substance severance benefits, although not so characterized)." (29 C.F.R. sec. 2501.3—2 (1984).) Furthermore, the above-cited regulation was sanctioned by Congress when in 1980 it added the following section to ERISA: "The Secretary may by regulation prescribe rules consistent with the standards and purposes of this chapter providing one or more exempt categories under which—(i) severance pay arrangements *** shall, for purposes of this subchapter, be treated as welfare plans rather than pension plans." (29 U.S.C. sec. 1002(2)(B) (1982).) Following the above analysis, several courts have concluded that severance pay plans similar to policy and procedure No. 1414-A1 are employee welfare benefit plans to which ERISA applies. (See, *e.g.*, *Holland v. Burlington Industries, Inc.* (4th Cir. 1985), 772 F.2d 1140, 1145, *aff'd sub nom. Brooks v. Burlington Industries, Inc.* (1986), 477 U.S. 901, 91 L. Ed. 2d 559, 106 S. Ct. 3267 (mem.); *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 710.) The parties were thus correct when they agreed that No. 1414-A1 is an employee welfare benefit plan under ERISA.

■ It should be noted that, although this case arises under Federal law, it was properly brought in the Illinois courts. Section 1132 of ERISA (29 U.S.C. sec. 1132(e)(1) (1982)) provides:

"Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section."

Subsection (a)(1)(B), referred to above, provides:

"(a) A civil action may be brought—
(1) by a participant or beneficiary—
* * *
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan ***."
(29 U.S.C. sec. 1132(a)(1)(B) (1982).)

Since the action here is brought by beneficiaries to recover benefits allegedly due them under their plan, Illinois courts have subject matter jurisdiction over the instant claim.

Although the parties agree that this action arises under ERISA, they disagree as to the proper interpretation of defendant's termination policy. Defendant argues that ERISA has superseded State law and that under governing Federal law, the decision to deny termination benefits to plaintiffs was not arbitrary and capricious.

Plaintiffs agree that the standard of review is whether defendant's interpretation was arbitrary and capricious. Plaintiffs argue, however, that No. 1414-A1 was part of their employment contracts and that they are eligible for termination benefits under the terms of the contract. They argue that they were terminated by defendant through no fault of their own and that defendant was arbitrary in refusing payment under the plan. In so arguing, plaintiffs rely mainly on several State contract cases, contending that such precedent can be considered in this action.

■ Plaintiffs' arguments based on State law are not well founded "because the decisions of the Federal courts are controlling upon our court in the interpretation of a Federal statute." (*Golden Bear Family Restaurants, Inc. v. Murray* (1986), 144 Ill. App. 3d 616, 619-20.) ERISA itself contains specific language to that effect. Section 1144(a) of ERISA (29 U.S.C. sec. 1144(a) (1982)) provides:

"Except as provided in subsection (b) [not applicable here] of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."

Furthermore, section 1144(c) of ERISA (29 U.S.C. sec. 1144(c) (1982)) defines "State law" as "includ[ing] all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." Not only do these provisions preempt any State-law causes of action relating to the plan (*Golden Bear Family Restaurants, Inc. v. Murray* (1986), 144 Ill. App. 3d 616, 620; *Holland v. Burlington Industries, Inc.* (4th Cir. 1985), 772 F.2d 1140, 1146, *aff'd sub nom. Brooks v. Burlington Industries, Inc.* (1986), 477 U.S. 901, 91 L. Ed. 2d 559, 106 S. Ct. 3267 (mem.)), they also supersede State decisional law relating to an employee benefit plan (*Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 714).

■ Under governing Federal law, this court is bound by the decision of the plan administrators unless the decision was arbitrary and capricious. (*Sly v. P. R. Mallory & Co.* (7th Cir. 1983), 712 F.2d 1209, 1211.) Where the plan is susceptible to more than one reasonable interpretation, the court may not substitute its judgment for that of the

administrators (*Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 712), even if it could be said that plaintiffs had acquired contractual rights under the policy (*Bruch v. Firestone Tire & Rubber Co.* (E.D. Pa. 1986), 640 F. Supp. 519, 523-524). In reviewing defendant's interpretation of its termination policy, this court is limited to determining whether that interpretation was made rationally and in good faith, not whether the interpretation was right. Accordingly, defendant's interpretation of the policy need not be the best possible decision, only one with a rational justification. *Griffis v. Delta Family-Care Disability* (11th Cir. 1984), 723 F.2d 822, 825.

■ Applying this standard to the facts of this case, it seems that defendant was not arbitrary and capricious in denying severance benefits to plaintiffs. Plaintiffs contend that the sale terminated their employment with B & W and that they are therefore entitled to termination benefits under the plain meaning of the policy. In deciding whether defendant's interpretation of the policy was arbitrary, however, it is necessary to read the policy as a whole. (*Sly v. P. R. Mallory & Co.* (7th Cir. 1983), 712 F.2d 1209, 1211.) Defendant points out that the policy as a whole contemplates that recipients of severance benefits would be unemployed. Policy and procedure No. 1414-A1 specifically provides that benefits thereunder were to assist terminated employees "during the re-employment adjustment period." In addition, no benefits would be paid to one who "declines to accept transfer to a reasonably comparable position."

When faced with a similar policy, the court in *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, noted that although employees were technically terminated by defendant at the time of the sale, it would still seem reasonable to treat the termination as not within the policy. (*Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 712-13.) Here, too, it seems reasonable to treat the sale and plaintiffs' immediate employment by Acme as not within the coverage of No. 1414-A1. Since plaintiffs did not lose any time from work as the result of the sale, they did not suffer a "re-employment adjustment period" as set forth in the policy.

■ Plaintiffs argue that defendant's stated purpose of providing a type of unemployment compensation is refuted by evidence that terminated employees who did receive benefits were not required to report subsequent employment. In addressing a similar argument, the United States Court of Appeals for the Fourth Circuit stated, "[t]his feature of the plan, however, could just as easily be attributed to the administrative convenience of avoiding the need to monitor former employees' status for up to twelve months. In any case, unemploy-

ment compensation was undoubtedly a major purpose of the plan." (*Holland v. Burlington Industries, Inc.* (4th Cir. 1985), 772 F.2d 1140, 1149, aff'd sub nom. *Brooks v. Burlington Industries, Inc.* (1986), 477 U.S. 901, 91 L. Ed. 2d 559, 106 S. Ct. 3267 (mem.).) The same reasoning holds true in this case as well.

Defendant's interpretation of No. 1414-A1 in this case is consistent with its interpretations in other similar situations. Henry Auricchio testified that B & W had sold several other facilities in 1981 and 1982. In none of those sales did defendant pay termination benefits to former employees who were immediately hired in comparable positions by the purchasers. It appears that defendant was following its uniform practice when it denied termination benefits to plaintiffs here. Federal courts have indicated that prior consistent interpretations are evidence of good faith. *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708; *Sly v. P. R. Mallory & Co.* (7th Cir. 1983), 712 F.2d 1209.

Plaintiffs argue that any ambiguity in the policy should be construed against defendant since defendant drafted the policy. While that maxim may hold true in an ordinary contract case, here we hold defendants to a different standard of interpretation than in a contract case. More to the point, Federal courts have "explicitly rejected the principle that an ambiguity in a plan should be interpreted in favor of coverage." *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 713, quoting *Smith v. CMTA-IAM Pension Trust* (9th Cir. 1981), 654 F.2d 650, 655.

Plaintiffs also argue that equity compels a finding that defendant was arbitrary and capricious. Plaintiffs state that they had a "justified expectation" that they would receive termination benefits. They contend that previously terminated employees would automatically receive such benefits. They also argue that Henry Auricchio promised they would receive termination benefits or at least have two weeks to decide whether to take the benefits or transfer their seniority to Acme. Plaintiffs also allude to some sinister motive behind the sale itself, contending that the sale was a "sham" and not an arm's length transaction between B & W and Acme.

■ Such arguments are unconvincing. There was no evidence that the sale of the Rockford facility was anything but an arm's length transaction. Although Acme did not receive orders for new machines after the sale, plaintiff Thomas Johnson testified that Acme was "quoting new work and hopefully trying to get orders." Plaintiffs imply that Acme never intended to continue operations after the work in progress was completed and that B & W knew of Acme's intention. Such speculation is not supported by the evidence, however, and the

trial court should not have considered this factor in deciding if defendant was arbitrary and capricious.

Likewise, plaintiffs' expectations do not change the equities of this case. Previously terminated employees did receive termination benefits, but they were not immediately reemployed in their same positions. Accordingly, defendant's application of No. 1414-A1 has not been inconsistent, and plaintiffs' expectations were unjustified if based only on the experience of laid off co-workers.

As for the meetings conducted by Henry Auricchio, what was said or promised is anything but clear. Many of the plaintiffs testified that Auricchio promised them a two-week option period in which to decide whether to be terminated by B & W and receive whatever benefits to which they were entitled or to transfer their seniority to the purchaser. While some plaintiffs believed they would receive termination benefits, others testified that termination pay was not specifically mentioned. Auricchio testified that the two-week option period he mentioned was in regard to employees who qualified for early retirement. They would be given time to decide to retire under B & W's pension plan or the purchaser's. Auricchio pointed out that negotiations for the sale of the Rockford plant were stalled and that he was in no position to make promises regarding transfers of seniority to a purchaser. It should also be noted that Auricchio was familiar with similar sales of B & W facilities where former employees had not been given termination benefits when they continued in their same positions with the purchasers. It seems unlikely that he would have made a contrary promise to plaintiffs in this case.

Regardless of what was said at the meetings, plaintiffs did not rely on it to their detriment. Under defendant's interpretation of No. 1414-A1, plaintiffs would not have been eligible for termination benefits under either option. Furthermore, if plaintiffs believed they would have been entitled to severance pay if they chose not to transfer seniority to Acme, they could have quit within two weeks and sought severance benefits and chanced being rehired. In any event, even if Auricchio had promised an option period, that would not make defendant's interpretation of the policy arbitrary and unreasonable.

■ Finally, plaintiffs argue that defendant's interpretation of No. 1414-A1 is rendered arbitrary and capricious by defendant's failure to comply with several ERISA requirements. Specifically, defendant did not inform the employees of benefits under policy and procedure No. 1414-A1, nor did defendant furnish the employees with a summary plan description, in violation of section 1022 of ERISA (29 U.S.C. sec. 1022 (1982)). Defendant also did not inform plaintiffs of the claim pro-

cedure under the policy or inform plaintiffs of the appeal procedure, both in violation of section 1133 of ERISA (29 U.S.C. sec. 1133 (1982)). Finally, defendant did not disclose the plan or report payments under the plan to the appropriate government agency, in violation of sections 1024 and 1023 of ERISA (29 U.S.C. secs. 1024, 1023(d)(1) (1982)).

In *Blau v. Del Monte Corp.* (9th Cir. 1984), 748 F.2d 1348, relied upon by plaintiffs, the court held that it was error for the trial court to grant summary judgment in favor of the employer in the face of "wholesale and flagrant" ERISA violations. The *Blau* court, however, did not hold that such violations make the denial of termination benefits arbitrary and capricious in and of themselves. (*Blau v. Del Monte Corp.* (9th Cir. 1984), 748 F.2d 1348, 1357.) Even that limited holding is questionable since the connection between violations of ERISA reporting procedures and whether the interpretation of the termination policy was arbitrary and capricious is attenuated at best.

As in *Holland v. Burlington Industries, Inc.*, "the facts of this case do not suggest a 'wholesale and flagrant' flouting of ERISA procedures that would indeed evidence bad faith and arbitrary behavior on an employer's part." (*Holland v. Burlington Industries, Inc.* (4th Cir. 1985), 772 F.2d 1140, 1149-50, *aff'd sub nom. Brooks v. Burlington Industries, Inc.* (1986), 477 U.S. 901, 91 L. Ed. 2d 559, 106 S. Ct. 3267 (mem.).) In *Blau*, the plan was actively concealed from the employees; here, although the policy was not generally distributed, it was not kept secret, and employees could examine the policy in the personnel department. In *Blau*, the employer never informed the employees of its decision to deny termination pay; here, defendant promptly answered plaintiffs' questions regarding severance pay and pensions. Moreover, the policy in *Blau* provided for severance pay when employees were terminated and could not be placed in "alternative employment opportunities *** within *the corporation*" (emphasis in original) (*Blau v. Del Monte Corp.* (9th Cir. 1984), 748 F.2d 1348, 1354); here the policy did not restrict the alternative employment to employment within the corporation.

Finally, we note that former B & W salaried employees at the Michigan AMD facility purchased by Acme also challenged defendant's interpretation of policy and procedure No. 1414-A1. The Federal district court in that case concluded that defendant's interpretation of No. 1414-A1 was not arbitrary and capricious and upheld defendant's denial of termination benefits to employees who continued in their same positions with Acme. (*Rolando v. Babcock & Wilcox Co.* (E.D. Mich. 1986), No. 84-CV-5009 (mem.).) We find the Federal court's de-

cision in favor of defendant's interpretation persuasive, if not controlling.

In conclusion, policy and procedure No. 1414-A1 did not clearly require the payment of severance benefits when defendant sold a plant and the employees were immediately reemployed by the purchaser. As the trial court noted, defendant's interpretation is a reasonable one, and the decision to deny severance benefits would seem to be rational and in good faith. Since defendant's interpretation was not arbitrary and capricious, this court should not now substitute its judgment for that of the plan administrators.

The judgment of the circuit court of Winnebago County is therefore reversed. The award of attorney fees is likewise reversed.

Reversed.

HOPF and UNVERZAGT, JJ., concur.