I. DEAN ARNOLD *et al.*, Appellants, v. THE BAB-COCK & WILCOX COMPANY, Appellee.

*Opinion filed May 26, 1988.*

68

Kalivoda & Shelton, of Rockford (Elizabeth C. Henriksen, of counsel), for appellants.

Connolly, Oliver, Close & Worden, of Rockford (Henry J. Close, of counsel), and Sullivan & Cromwell, of New York, New York (William A. Ziegler, of counsel), for appellee.

JUSTICE MILLER delivered the opinion of the court:

The plaintiffs, who are 25 former salaried employees of the defendant, the Babcock & Wilcox Company (B&W), brought this action in the circuit court of Winnebago County to recover certain severance benefits from B&W under the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§1001 through 1461 (1982)) (ERISA). Following a bench trial, the circuit judge entered judgment for the plaintiffs, awarding them a total of $181,590.01 in damages, plus attorney fees of $30,000. The appellate court reversed the trial court's judgment. (154 Ill. App. 3d 863.) We allowed the plaintiffs' petition for leave to appeal (see 107 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

The plaintiffs were employed by B&W at its manufacturing plant in Rockford. The Rockford facility was a unit of the automated machine division of B&W, which itself is a wholly owned subsidiary of McDermott International, Inc. B&W's main line of business is the design, manufacture, and construction of power generation systems; the automated machine division manufactured machine tools and nuclear components. In 1981, B&W de-

cided to leave the machine tool business and began searching for a buyer for the automated machine division, which included plants in Rochester, Michigan, and Greer, South Carolina, in addition to that in Rockford. B&W sold the division to Acme Precision Products, Inc., in 1982. In the transaction, Acme purchased the entire operations of the Rockford facility, including the plant, inventory, and equipment. The sale was announced by Acme to the employees in Rockford on June 17, 1982, and the transfer of assets occurred the next day, June 18. Acme's announcement of the sale said, "It is our intention to continue the operations of this facility in essentially the same manner as operated by The Babcock & Wilcox Company. Accordingly, effective June 18, 1982, all current salaried employees will report at their regular time and become ACME PRECISION PRODUCTS, INC. employees." The announcement also said, "Wages and benefits will be continued as presently in force, although we are considering the need to make changes in some of the benefits." Thus, at the time of the sale of the Rockford plant, the plaintiffs became employees of Acme, and there was no interruption in their work. Acme retained the plaintiffs in the same positions and pay levels they had occupied as employees of B&W. Acme initially maintained fringe benefits at the prior levels, but it later reduced them, eliminating the severance pay provisions and a thrift incentive plan. Acme closed the Rockford plant late in 1983; by that time, each of the plaintiffs either had quit his or her employment with Acme or had been laid off by Acme.

In the wake of the sale of the Rockford plant to Acme, the plaintiffs requested from B&W two severance benefits they believed they were entitled to under the company's written guidelines concerning terminations from employment. The first benefit was a termination allowance, which was computed on the basis of each sala-

ried employee's weekly earnings, age, and length of employment with B&W. The second benefit provided for two weeks' pay in lieu of notice of termination of employment. It has been the plaintiffs' theory throughout these proceedings that B&W's sale of the Rockford plant, and the plaintiffs' subsequent employment by the new owner, Acme, terminated their employment with B&W and therefore made them eligible for, and entitled to, the severance benefits at issue here. In August 1982 a number of the plaintiffs wrote to B&W requesting the severance benefits. In response, B&W's retirement and pension board sent to the former salaried employees of the automated machine division a four-page reply to the severance-benefit requests as well as to a number of other questions that had arisen from the sale of the division to Acme. B&W explained that the employees who had been retained in their positions by the purchaser, Acme, were not eligible for the termination allowance because they had not been terminated by B&W and because they had been transferred to reasonably comparable positions. This action ensued.

The original basis for the plaintiffs' action was breach of contract. In a two-count complaint, the plaintiffs alleged that B&W's written policy regarding termination allowances and pay in lieu of notice of termination was a part of their employment contract with the company and that B&W breached the contract by refusing to make those payments. The plaintiffs later amended both counts of their complaint by alleging that B&W's refusal to pay the benefits was a violation of the Illinois Wage Payment and Collection Act (Ill. Rev. Stat. 1983, ch. 48, pars. 39m—1 through 39m—15). The plaintiffs eventually added a third count to their complaint; there they alleged that B&W's refusal to pay the severance benefits was a violation of the Employee Retirement Income Se-

curity Act of 1974 (29 U.S.C. §§1001 through 1461 (1982)) (ERISA).

Following a bench trial, the trial judge found in the plaintiffs' favor and awarded them a total of $152,413.77 in termination allowances and a total of $29,176.24 in pay in lieu of notice of termination; the damages were liquidated, there being no dispute concerning the calculation of those sums. The amounts awarded to the individual plaintiffs for the termination allowance ranged between $22,912.47 and $864, and for the two weeks' pay in lieu of notice of termination between $1,697.22 and $432. The plaintiffs also submitted a petition seeking an award of attorney fees, and, following a hearing on the matter, the trial judge awarded the plaintiffs $30,000 in fees.

There is no dispute here that the severance provisions at issue are an "employee welfare benefit plan" within the meaning of section 3(1)(B) of ERISA (29 U.S.C. §1002(1)(B) (1982)). (See *Fort Halifax Packing Co. v. Coyne* (1987), 482 U.S. 1, 7 & n.5, 18 & n.11, 96 L. Ed. 2d 1, 8 & n.5, 15-16 & n.11, 107 S. Ct. 2211, 2215 & n.5, 2221 & n.11.) A plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, [or] to enforce his rights under the terms of the plan" (29 U.S.C. §1132(a)(1)(B) (1982)); the action authorized by that provision may be brought in either State or Federal court (29 U.S.C. §1132(e)(1) (1982)). In this case, ERISA preempted the plaintiffs' State-law causes of action based on breach of contract and violation of the Illinois Wage Payment and Collection Act. Section 514(a) of ERISA broadly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" falling within ERISA's scope. (29 U.S.C. §1144(a) (1982); see *Shaw v. Delta Air Lines, Inc.* (1983), 463 U.S. 85, 96-99, 77 L. Ed. 2d 490, 501-02, 103 S. Ct. 2890, 2899-2901

(discussing preemptive effect of ERISA).) In that context, "State law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law." (29 U.S.C. §1144(c) (1982).) Accordingly, in actions brought by employees to recover severance benefits, the preemption provision of ERISA has been construed as barring causes of action based on State common law and statutory law. (See, *e.g., Holland v. Burlington Industries, Inc.* (4th Cir. 1985), 772 F.2d 1140, 1146-48, *aff'd mem. sub nom. Brooks v. Burlington Industries, Inc.* (1986), 477 U.S. 901, 91 L. Ed. 2d 559, 106 S. Ct. 3267 (breach of contract, estoppel, and violation of State wage payment statute); *Blau v. Del Monte Corp.* (9th Cir. 1984), 748 F.2d 1348, 1356-57 (breach of contract, estoppel, and fraud); *Mylstar Electronics, Inc. v. McNeil* (N.D. Ill. June 2, 1986), No. 86—C—387 (available on LEXIS, Genfed library, Dist. file) (violation of Illinois Wage Payment and Collection Act).) The only claim before us, then, is that alleging a violation of ERISA.

The plaintiffs originally agreed with B&W that the "arbitrary and capricious" standard was applicable here in determining whether the company's refusal to pay the contested benefits could stand. Until recently, courts applied that standard, without exception, in ERISA actions involving claims of improperly denied benefits. (See, *e.g., Blakeman v. Mead Containers* (6th Cir. 1985), 779 F.2d 1146, 1149-50; *Anderson v. Ciba-Geigy Corp.* (11th Cir. 1985), 759 F.2d 1518, 1522; *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 711; *Sly v. P. R. Mallory & Co.* (7th Cir. 1983), 712 F.2d 1209, 1211; *Dennard v. Richards Group, Inc.* (5th Cir. 1982), 681 F.2d 306, 313.) Consistent with that authority, the circuit and appellate courts in this case applied the arbitrary and capricious standard in reviewing B&W's decision to deny the plaintiffs the severance benefits at issue here. And in the petition for leave to appeal and the brief filed in this court, the plain-

tiffs continued to adhere to the view that the arbitrary and capricious standard governed this case. At oral argument, however, the plaintiffs suggested that a standard of review less deferential to the interests of the employer would be appropriate (see *Van Boxel v. Journal Co. Employees' Pension Trust* (7th Cir. 1987), 836 F.2d 1048; *Bruch v. Firestone Tire & Rubber Co.* (3d Cir. 1987), 828 F.2d 134, *cert. granted* (U.S. April 4, 1988), No. 87—1054, 56 U.S.L.W. 3682; *Harris v. Pullman Standard, Inc.* (11th Cir. 1987), 809 F.2d 1495), and we allowed the parties to submit supplemental briefs on that question.

We decline here to suggest a formulation different from the familiar and widely accepted "arbitrary and capricious" standard. In *Van Boxel* Judge Posner noted, "[F]lexibility in the scope of judicial review need not require a proliferation of different standards of review; the arbitrary and capricious standard may be a range, not a point." That case involved the denial of a pension by a company's pension trust. The court went on to say:

> "Flexibly interpreted, the arbitrary and capricious standard, though infelicitously—perhaps even misleadingly—worded, allows the reviewing court to make the necessary adjustments for possible bias in the trustees' decision. So there is no urgent need to throw it overboard and cast about for an alternative verbalization. Where *** the claimant does not argue or is unable to show that the trustees had a significant conflict of interest, we reverse the denial of benefits only if the denial is completely unreasonable. The greater the conflict of interest of a majority of the trustees, the less we defer to a denial of benefits that appears to be wrong." (*Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d at 1053.)

In their supplemental brief, the plaintiffs in this case contend that B&W had no possible reason to grant the request for benefits, because any amounts paid would

come from the company's general assets. The plaintiffs therefore believe that the decision to deny them the severance benefits should be viewed with special caution. For the reasons set out below, we conclude here that B&W's decision to deny the plaintiffs the requested severance benefits was warranted under the terms of the severance provisions and was not arbitrary and capricious, even under the more searching review proposed by the plaintiffs in their supplemental brief.

The dispute in this case centers on a written policy of B&W that was contained in the company's administrative manual and was identified there as Policy and Procedure No. 1414—A1. With respect to an employee's eligibility for the termination allowance, Policy No. 1414—A1 states:

> "Full-time, salaried employees whose services are permanently terminated by the Company and who have either
>
> a. One or more years of company service (if over 45 years of age), or
>
> b. Five or more years of company service (regardless of age)
>
> are eligible under the following conditions:
>
> 1. Elimination of previously required services, due to consolidation of departments, mergers, abandonment of plants and offices, technological changes and declining business activity. No allowance may be paid where employee declines to accept transfer to a *reasonably* comparable position.
>
> 2. Employees who are unable to work at their own jobs or other jobs within their capacity due to physical disability as determined by a physician designated by the Company." (Emphasis in original.)

Policy and Procedure No. 1414—A1 also contains the following express limitations on the availability of the termination allowance:

> "1. Termination Allowances are not payable:

A. When curtailment of activities of the Company is due to acts of God, conditions of war, strikes or governmental action.

B. Under the following types of separation:

1. Temporary layoff where it is likely the employee will be offered reemployment

2. Military service

3. Retirement where the employee is immediately eligible under the Employee Retirement Plan

4. Discharge for proper cause

5. Quit or resignation

6. Death."

With respect to the payment of two weeks' pay in lieu of notice of termination, Policy No. 1414—A1 provides:

"Employees with one or more years of company service shall be given a minimum of two weeks' notice or pay in lieu thereof.

Whenever practical, additional notice should be provided to enable the affected employee to make a satisfactory readjustment. Pay in lieu of notice, where given, shall be in addition to any termination allowance the employee may receive."

With respect to both the termination allowance and the provision for pay in lieu of notice of termination, Policy No. 1414—A1 provides, "Request for payments under this guide must be in writing and approved by those responsible for authorizing the hiring of new employees and making salary adjustments for present employees. Final approval is limited to the Division Head."

The plaintiffs contend that B&W's sale of its Rockford plant to Acme resulted in a termination of their employment with B&W, therefore making them eligible for, and entitled to, the termination allowance provided by B&W's Policy No. 1414—A1. The plaintiffs similarly believe that B&W's failure to provide them with two weeks'. notice of the sale, and consequent termination

from employment, made them eligible for, and entitled to, two weeks' pay in lieu of notice of termination.

B&W's Policy No. 1414—A1 does not speak directly to the question presented here, the eligibility for severance benefits of employees of divested operations who are retained in their positions, without interruption, by the purchaser of those operations. B&W contends, however, that it did not act arbitrarily or capriciously in denying the plaintiffs severance benefits here.

In support of its interpretation of Policy No. 1414—A1, B&W contends that the severance benefits, properly understood, are intended for employees who become unemployed. That the purpose of the severance benefits was to provide a private form of unemployment compensation is made clear by the statement of policy appearing in the document. It says, "Permanently terminated salaried employees, under certain circumstances, will be compensated to assist them financially during the re-employment adjustment period, provided termination is made by management through no fault of the employees." In B&W's view, the plaintiffs were not terminated from employment within the meaning of its severance benefit policy. That interpretation is a reasonable one. Acme, purchaser of the Rockford operation, retained the plaintiffs in the same positions they held before the sale and paid them the same salaries they earned beforehand. Thus, the plaintiffs did not undergo a "re-employment adjustment period" in the wake of the sale of the Rockford plant.

The termination allowance provision also says, "No allowance may be paid when employee declines to accept transfer to a *reasonably* comparable position." (Emphasis in original.) Thus, the allowance is not available for employees who are transferred to reasonably comparable positions. B&W contends that in this case the plaintiffs were transferred to reasonably comparable positions

when they became employees of Acme at the same pay rates, and in the same positions, as they enjoyed with B&W. That interpretation is reasonable, in light of the emphasis in the policy on a recipient's unemployment. Acme's failure to maintain the fringe benefits at the previous level did not, in our opinion, mean that B&W was unreasonable in taking the view that the positions under Acme were comparable. See *Anderson v. Ciba-Geigy Corp.* (11th Cir. 1985), 759 F.2d 1518, 1522.

Moreover, B&W has consistently interpreted Policy No. 1414—A1 in the same manner in which those provisions were interpreted here. According to the trial evidence, in other cases involving divestitures of operations B&W has not paid severance benefits to those employees who were retained in their positions by the purchasers of those operations. Although consistency is not a dispositive virtue—an employer may be consistently wrong in its interpretation of an employee benefit provision (see *Dennard v. Richards Group, Inc.* (5th Cir. 1982), 681 F.2d 306, 318)—courts reviewing ERISA claims have generally credited an employer's consistent interpretation and application of a benefit provision as tending to demonstrate an absence of arbitrariness and capriciousness. (*Anderson v. Ciba-Geigy Corp.* (11th Cir. 1985), 759 F.2d 1518, 1522; *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 713; *Sly v. P. R. Mallory & Co.* (7th Cir. 1983), 712 F.2d 1209, 1213.) Here, B&W's interpretation of Policy No. 1414—A1 was a reasonable one, and that is the interpretation that B&W has consistently followed in identical circumstances. For those reasons, we do not believe that B&W acted arbitrarily and capriciously in denying termination benefits to the plaintiffs.

The plaintiffs assert that B&W violated certain disclosure and reporting requirements of ERISA by failing to provide employees with formal information concerning the benefit plan, including procedures for claiming bene-

fits, and by failing to report to the government the existence of the plan and the payment of benefits under it. (See 29 U.S.C. §§1022, 1023(D)(1), 1024, 1133 (1982).) Citing *Blau v. Del Monte Corp.* (9th Cir. 1984), 748 F.2d 1348, the plaintiffs suggest that it was B&W's intention to keep the severance provisions secret and that the company's interpretation of the plan was equally secret and should be accorded no weight.

Like this case, *Blau* involved a corporate divestiture, and the dispute there arose from the denial by the seller, Del Monte, of severance benefits to those employees who were retained in their positions by the purchaser of the divested operation. The employees sued under ERISA to recover those benefits, and the district court granted Del Monte's motion for summary judgment. The court of appeals reversed, rejecting the district court's conclusion that Del Monte's refusal to pay the severance benefits was, as a matter of law, not arbitrary and capricious. Discussing Del Monte's numerous violations of ERISA, the court of appeals noted that an employer's failure to observe those statutory provisions does not normally give rise to a substantive remedy. In that case, however, the company's numerous violations of the reporting and disclosure requirements, together with its active concealment of the plan, led the court to hold "that the type of plan administration practiced by Del Monte is highly probative of whether a particular decision to deny benefits was infected by its having been made in conformity with the objectionable scheme." (*Blau*, 748 F.2d at 1354.) The Del Monte severance plan conditioned eligibility for benefits simply on job elimination and the absence of other positions within Del Monte, and the court believed that Del Monte, in denying benefits to the employees of the divested operation, was imposing a standard that was not found in the severance benefit provisions. Therefore, the court discounted Del Monte's argument

that the intended beneficiaries of the program were persons who were unemployed. The court said:

> "Nor can we permit resort to Del Monte's secret intentions behind its secret severance pay policy to imply these conditions into the plan. Del Monte claims that the secret purpose behind its secret severance benefit policy was to benefit only those employees who were without a job of any kind after termination. We decline to refer to the secret intent behind. a secret plan to determine whether the denial of severance benefits in this case was not arbitrary and capricious. Allowing reference to this factor would only encourage violation of ERISA's reporting and disclosure requirements, in the hope of later being able to interpret the policy through the cost-benefit analysis of hindsight." (748 F.2d at 1355.)

The court reversed the order granting Del Monte's motion for summary judgment and remanded the action for further proceedings.

Other cases have rejected the argument, based on *Blau*, that a company's failure to comply with ERISA's procedural requirements necessarily undermines an employer's interpretation of its benefits policies. (*Holland v. Burlington Industries, Inc.* (4th Cir. 1985), 772 F.2d 1140, 1145, *aff'd mem. sub nom. Brooks v. Burlington Industries, Inc.* (1986), 477 U.S. 901, 91 L. Ed. 2d 559, 106 S. Ct. 3267; *Anderson v. Ciba-Geigy Corp.* (11th Cir. 1985), 759 F.2d 1518, 1521; *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, 714-15; see also *Gilbert v. Burlington Industries, Inc.* (2d Cir. 1985), 765 F.2d 320, 329, *aff'd mem.* (1986), 477 U.S. 901, 91 L. Ed. 2d 558, 106 S. Ct. 3267.) Although B&W did not distribute copies of Policy No. 1414—A1 to its employees, the plaintiffs in this case were aware of those provisions before the sale to Acme took place, and the company made no attempt to keep the severance benefits provisions secret. Moreover, unlike the employer in *Blau*, B&W responded to the employees' requests for severance payments, ex-

plaining in writing the basis for its decision to deny those benefits. In these circumstances, it cannot be said that B&W "flouted" ERISA's requirements "in a wholesale and flagrant manner" (*Blau*, 748 F.2d at 1352), and therefore we conclude that the company's interpretation and application of its severance provisions was not undermined by the ERISA violations alleged here.

The plaintiffs also argue that termination pay or severance pay is a form of deferred compensation, rather than a form of unemployment compensation, and they conclude that eligibility for severance pay under B&W's Policy No. 1414—A1 should not depend on whether the purchaser of a divested operation, such as Acme, retains the seller's employees. In support of that argument, the plaintiffs cite a number of decisions, most of them decided before ERISA was enacted, interpreting the operation of severance provisions upon a sale of assets. The plaintiffs make the related contention that the severance provisions became a part of their employment contract with B&W and therefore constituted a binding agreement with the company. See *Chapin v. Fairchild Camera & Instrument Corp.* (1973), 31 Cal. App. 3d 192, 107 Cal. Rptr. 111; *Willets v. Emhart Manufacturing Co.* (1965), 152 Conn. 487, 208 A.2d 546; *Mace v. Conde Nast Publications, Inc.* (1967), 155 Conn. 680, 237 A.2d 360; *Dahl v. Brunswick Corp.* (1976), 277 Md. 471, 356 A.2d 221; *Hinkeldey v. Cities Service Oil Co.* (Mo. 1971), 470 S.W.2d 494.

The same cases were cited by the plaintiffs in *Jung v. FMC Corp.* (9th Cir. 1985), 755 F.2d 708, which, like the instant case, was an action under ERISA to recover severance benefits following the sale of a corporate division. Rejecting the argument that the employer's policy of paying severance benefits gave the plaintiffs a contractual right to receive those benefits, the court in *Jung* said:

"In the first place, the relevant provisions of ERISA have superseded state law, including decisional law, relating to an employee benefit plan. 29 U.S.C. sec. 1144(a) and (c).

Furthermore the state law cases just cited involve different facts. In all but *Chapin* and *Willets* the critical language turned on the general terms termination, severance, or separation. Although in *Chapin* and *Willets* the policy used the terms layoff and lack of work, it did not contain the terms of the Policy Guide reflecting concern over a period of unemployment. In *Chapin* the court appeared to attach importance to the facts that the employees were hired by the Buyer under substantially different terms that did not provide severance pay of the same duration and did not undertake to discharge the Seller's obligation of severance pay. [Citation.]

And as already noted, this court rejects the proposition intrinsic in the foregoing state law contract cases, that the plan must be construed in favor of coverage." *Jung*, 755 F.2d at 714.

The plaintiffs contend, however, that if the actual purpose of the severance provisions is to provide a form of unemployment compensation, as B&W asserts, then terminated employees receiving benefits under those provisions should be required to report to B&W their later success in finding new jobs. The plaintiffs note that Policy No. 1414—A1 requires former employees to repay the termination allowance only if they are rehired by B&W within a specified period of time. We do not agree with the plaintiffs that B&W's interpretation of its severance provisions should be discounted for that reason. As the appellate court noted here (154 Ill. App. 3d at 871), the absence of a requirement that terminated employees receiving the allowance report their later employment may be attributed simply to administrative convenience. See *Holland v. Burlington Industries, Inc.* (4th Cir. 1985), 772 F.2d 1140, 1146, *aff'd mem. sub*

*nom. Brooks v. Burlington Industries, Inc.* (1986), 477 U.S. 901, 91 L. Ed. 2d 559, 106 S. Ct. 3267.

The plaintiffs also refer to evidence regarding meetings of the employees with Henry Auricchio, vice-president of industrial relations for B&W, at the Rockford plant on April 14, 1982. According to the plaintiffs' testimony, Auricchio told them that B&W was attempting to sell the automated machine division, including the Rockford operation, and that the employees would be given notice of the sale. The plaintiffs also testified that Auricchio told them that they would be given two weeks in which to decide whether to be terminated by B&W and receive severance benefits, in which case they could simply apply for employment with the purchaser, or to receive no benefits from B&W and continue in their current positions with the purchaser. At trial, Auricchio denied that he had suggested that the employees would be given that choice. The plaintiffs argue that they relied on Auricchio's promise and that they expected that they would be allowed to make that choice.

It is not clear in what respect the plaintiffs believe that Auricchio's disputed statements should affect our result here. As we have noted, ERISA preempts State causes of action; thus, the plaintiffs cannot argue that the availability of benefits under B&W's Policy No. 1414—A1 should arise from an alleged estoppel. Moreover, there is no indication here that the plaintiffs relied to their detriment on his remarks.

As further evidence of the unreasonable nature of B&W's interpretation of Policy No. 1414—A1, the plaintiffs note that the term "layoff" was marked on the form used by them to withdraw their funds from the B&W thrift incentive plan following the sale of the Rockford plant to Acme. In the plaintiffs' view, the use of that term indicated that the sale of the plant terminated their employment with B&W under the severance

benefits policy. We do not believe that the use of the term "layoff" in that limited context has any special significance here. As it was explained at trial, the thrift plan withdrawal forms contained a brief list of reasons for the withdrawal; the sale of a plant was not included in the list, and "layoff" was deemed to be the closest approximation to what occurred here. We see no inconsistency between the two.

Nor is there any reason to reach a different result with respect to the provision regarding two weeks' pay in lieu of notice of termination. If the sale of B&W's Rockford plant and the subsequent hiring of those employees by the purchaser did not result in a termination of employment, as that term is used in the termination allowance provisions, then the same series of events cannot be said to have triggered application of the companion provision requiring two weeks' pay in lieu of notice of termination.

We also note the suggestions made by the plaintiffs, and by the trial judge, that the sale of the Rockford plant was a sham. The trial judge noted that, according to testimony in this case, the machine tool business was depressed in 1982 and the unemployment rate in Rockford was as high as 22%. Apparently the plaintiffs would infer from those circumstances that the agreement between B&W and Acme involving the sale of the automated machine division was not an arm's length transaction or was otherwise lacking in good faith.

There was no evidence presented in this case that would support the plaintiffs' speculations regarding the sale. The testimony concerning the state of the machine tool industry at the time of the sale simply shows that B&W was eager to divest itself of that part of its business; it does not show that Acme was not a *bona fide* purchaser, for Acme may have simply been able to obtain a favorable price for the business.

Finally, we note that the same issues have been raised in a Federal case, *Rolando v. Babcock & Wilcox Co.* (E.D. Mich. February 20, 1986), No. 84—CV—5009. *Rolando* involved the sale of B&W's plant in Rochester, Michigan, which, like the Rockford plant, was acquired by Acme in 1982 when B&W sold its automated machine division. As in this case, B&W refused to pay severance benefits to those employees at the Rochester plant who were retained in their positions by Acme. Rejecting many of the same arguments that are made by the plaintiffs in this case, the district judge in *Rolando* ruled, as we do, that B&W did not act arbitrarily or capriciously in denying the employees the severance benefits described in Policy No. 1414—A1.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*