BABCOCK & WILCOX COMPANY, Petitioner, v. THE DEPARTMENT OF
HUMAN RIGHTS *et al.*, Respondents.

Second District No. 2—88—0735

Opinion filed October 13, 1989.

LINDBERG, J., dissenting.

Henry J. Close, of Connolly, Oliver, Close & Worden, of Rockford, and Sullivan & Cromwell, of New York, New York (William A. Ziegler, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield, and Office of Gen-

eral Counsel, of Human Rights Commission, of Chicago (Robert J. Ruiz, Solicitor General, and Deborah L. Ahlstrand, Assistant Attorney General, of Chicago, of counsel), for respondents Human Rights Commission and Department of Human Rights.

Carol H. Hallock, of Williams & McCarthy, P.C, of Rockford (Samuel J. Castree, Jr., of counsel), for respondents Edmund Henkelman, Oleta Britt, Elden Amans, Florence Maycraft, Dwight VanFleet, Gerald Stahl, James Breseman, Charles Rewerts, Godfrey Farrell, Thomas Ivy, John Downing, Arthur Helgerson, and Walter Pierce.

Smith, Hallock & Talley, of Rockford, for other respondents.

JUSTICE NASH delivered the opinion of the court:

This case was initiated by a complaint filed with the Illinois Human Rights Commission (the Commission) by the Department of Human Rights (the Department) on behalf of certain former employees of petitioner, the Babcock & Wilcox Company (B&W). The complaint charged that B&W violated section 2—102(A) of the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A)) (Human Rights Act) by maintaining and implementing a severance pay policy which denied severance pay to complainants because they were eligible to retire on pensions, which was alleged to be an impermissible age-related criterion. The Department moved for partial summary judgment before the Commission, and B&W sought dismissal of the complaints. B&W now appeals from the order and decision of the Commission which granted the Department's motion for summary judgment, contending that (1) ineligibility for a termination allowance based on immediate eligibility for, retirement benefits was not impermissible age discrimination because age was not the differentiating factor and there was no intent of the employer to discriminate because of age; (2) that the challenged action is exempt from the prohibitions of the Human Rights Act because it was taken pursuant to a retirement system that is not used as a subterfuge for and does not have the effect of unlawful discrimination; and (3) the claims of those complainants who were hourly employees were waived by a contract entered into between B&W and their collective bargaining representatives, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and its Local 528 (the Union). We reverse.

The individual complainants each filed charges with the Department alleging that B&W violated the Illinois Human Rights Act when

it denied them severance pay on the ground they were eligible to retire and receive pensions. The Department filed a complaint with the Commission pursuant to section 7–102 of the Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 7–102(F)) which alleged, and B&W's answer admitted, that complainants Roland Berglund, Margaret Dreesen, and John Campbell were each salaried employees of B&W, over the age of 40, with more than 15 years of service with B&W at the time it ceased its Illinois operations on October 31, 1983; the remaining complainants were B&W hourly employees between the ages of 40 and 70 at the time of their separation from B&W's employ and were production workers subject to the terms of a contract entered into on March 22, 1983, between B&W, UAW, and the Union, which provided for a separation allowance to employees meeting the eligibility requirements contained therein. The complaint further alleged that, but for B&W's claimed age-discriminatory separation allowance policy, and other acts of discrimination, the complainants would have been eligible for a separation allowance.

The Department moved for partial summary judgment, and B&W filed an affidavit in opposition to that motion and in support of its cross-motion for summary judgment. While B&W's counteraffidavit is part of the record on appeal, its cross-motion for summary judgment is not. The Department's motion and B&W's counteraffidavit show that in 1963 B&W acquired its Rockford, Illinois, facilities and its operations there were part of its Automated Machine Division (AMD). AMD performed nuclear core structural work and produced automated machines in the Rockford facilities. In the spring of 1981, the nuclear core structural work was transferred from AMD to another B&W group, and in 1982, the Rockford plant was transferred to Acme Precision Products (Acme), an unaffiliated company. Acme continued the automated machine activities formerly conducted by B&W, employing some former B&W salaried employees associated with the automated machine activities. Litigation respecting B&W's denial of termination benefits to those employees was resolved in *Arnold v. Babcock & Wilcox Co.* (1987), 154 Ill. App. 3d 863, 507 N.E.2d 218, *aff'd* (1988), 123 Ill. 2d 67, 525 N.E.2d 59.

B&W subsequently leased space from Acme at the Rockford plant for the purpose of performing its nuclear core structural work and all complainants continued their employment with B&W for that purpose until about October 31, 1983, when B&W ceased its Rockford operation. All of the complainants were denied a termination allowance by B&W.

HOURLY EMPLOYEES

On March 22, 1983, UAW and the Union entered into a contract with B&W on behalf of the hourly employees in contemplation of the plant closing, which provided that an active employee "who is not eligible for a normal, early, special early or disability retirement under the Service Benefit Pension Plan" would be entitled to a separation allowance based on years of service. A minimum of three years' seniority was necessary to be eligible for the allowance, and the agreement provided that the separation allowance would be paid in a lump sum and would not be considered as a payment in lieu of wages.

Generally, any person who was an hourly employee on December 31, 1975, became a member of the Company Service Benefit Pension Plan, and any person becoming an hourly employee thereafter became a member of the plan upon the latter of the date the employee completed one year of continuous service or reached age 25. An employee's membership in the plan ceased upon termination of his employment unless such termination was by reason of retirement. Eligibility for normal, early, and special early retirement was as follows:

"1. Normal Retirement: a member who is 65 years of age on the retirement date. Benefits equal a specified monthly amount for each year of credited service.

2. Early Retirement: a member who has at least 15 years of service and is age 55 or older on the retirement. Benefits are computed in accordance with the normal retirement provisions contained in the plan but are reduced by 4/10 of 1% for each month by which the member has not attained age 62 at the time of retirement.

3. Special Early Retirement: a member who has at least 10 years of service and age 62 or older on the retirement date.

4. Disability Retirement: a member who has at least 10 years of service and has a permanent and total disability on the retirement date. If the pension commenced prior to age 55, the maximum pension was the equivalent actuarial value to the maximum pension payable at age 55."

All of the hourly employee complainants were ages 55 through 64 except for Thomas Ivy, who was 65 years old, and, pursuant to the terms of the plant closing agreement, these employees were denied a termination allowance because they were eligible to retire. The collective bargaining agreement which was in effect from March 28, 1980, through October 31, 1983, has no provision for a separation allowance, and neither that contract nor the service benefit pension plan states that an hourly employee who is eligible for a retirement pen-

sion will not be eligible for a separation allowance.

SALARIED EMPLOYEES

At the time B&W ceased its Rockford operations, its policy and procedure No. 1414—A1 regarding termination benefits for salaried employees provided that the termination pay awarded was to assist financially those permanently terminated salaried employees during their reemployment adjustment period. Policy and procedure No. 1414—A1 provides that termination allowances were not available if a salaried employee was immediately eligible to retire pursuant to the employee retirement plan (the retirement plan). A salaried employee over 45 years of age was eligible for the termination allowance if he had one or more years of service; all salaried employees with five or more years of service were eligible regardless of age. A copy of policy and procedure No. 1414—A1 was available for employee inspection in the personnel department and had been in effect since at least 1960.

Membership in the salaried employees' retirement plan was generally the same as that under the hourly employees' pension plan and, like that plan, a salaried employee's membership ended upon termination of employment. Salaried employees were eligible for retirement benefits as follows:

"1. Normal Retirement: a member who is 65 years of age on the retirement date. The minimum annual pension payable to a member who has completed 15 or more years of credited service is $1,500; the minimum pension payable to a member with less than 15 years of service is equal to $1,500 multiplied by the ratio that years of credited service bears to 15.

2. Early Retirement: a member who has at least 15 years of service and age 50 or older on the retirement date. Benefits are computed in accordance with the normal retirement provisions contained in the plan but if the total of the member's age and years of credited service is less than 75, certain reductions in benefits are set forth in the plan.

3. Disability Retirement: a member who has at least 15 years of service and a permanent and total disability on the retirement date."

The current retirement plan, effective March 1, 1979, did not state that termination allowances would be denied if a salaried employee was eligible for immediate retirement. The summary plan description, dated May 1976, provided, however, that an employee's pension would be reduced by any dismissal allowance, and that "[t]his booklet summarizes only the main features of the Employee Retirement Plan and

does not attempt to cover all details. These are provided in the official plan text and Trust Agreement which legally govern the operation of the plan. Copies of these documents *** are available for review by any plan member at your local personnel office." The retirement plan, effective January 1, 1972, as well as other prior versions of the retirement plan dating back to 1955, provided that the amount of pension payable to a retired employee would be reduced by the amount of any dismissal allowance paid or payable to a retired or terminated employee.

In summary, the undisputed facts show that B&W denied a termination allowance to those complainants who were salaried employees in accordance with its long-established written company policy and procedure and that those complainants who were hourly employees were denied termination pay as was provided in the plant closing agreement entered into between B&W and the hourly employees' union representatives. Further, the established company retirement plans for both hourly and salaried employees do not state that retirement-eligible employees would be denied termination pay.

The Department moved for partial summary judgment on the issue of liability, and B&W apparently filed a cross-motion for summary judgment seeking dismissal of the complaint. Initially, we note that the administrative law judge (ALJ) made inconsistent findings of fact regarding the status of complainants Berglund, Dreesen, and Campbell as salaried or hourly employees. As the Department's complaint and B&W's answer make clear, these are salaried employees, and neither B&W nor the Department disputes this fact on appeal.

The ALJ, in her interim recommended order and decision, concluded that B&W's policy of denying severance pay to employees eligible to retire with a pension resulted in age discrimination prohibited by section 2—102(A) of the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A)) and that complainants were thus treated disparately from nonpension-eligible employees who received the severance pay. The ALJ also concluded that B&W's severance pay policy was not exempt as a merit or retirement system under section 2—104(5)(a) of the Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a)), and that B&W's affirmative defense of waiver was not a defense to the Human Rights Act's prohibition against unlawful discrimination on the basis of age. In concluding that B&W's severance pay policy was not exempt under section 2—104(5)(a) of the Human Rights Act, the ALJ recommended that the Human Rights Commission adopt the rationale of some Federal cases which have interpreted an analogous Federal provision under the Federal Age Discrimination

in Employment Act of 1967 (29 U.S.C. §623(f)(2) (1982)). These cases hold that age-based distinctions in employee benefit plans must be justified by significant cost considerations and, because the age of an employee has no relation to the cost of severance pay to an employer, a severance pay policy which denies the award to the older worker is age discriminatory. B&W filed exceptions to the interim recommended order and decision, and the ALJ thereafter entered her recommended order and decision sustaining the complaints.

On June 28, 1988, the Commission entered an order affirming the recommended order and decision, finding that B&W's severance policy was facially discriminatory, and B&W's exceptions were denied. Because the Department does not argue that B&W's failure to file its exceptions to the recommended order and decision waives those exceptions, we do not consider the issue. Cf. *Glassworks, Inc. v. Human Rights Comm'n* (1987), 164 Ill. App. 3d 842, 849, 518 N.E.2d 343 (where objections were filed with the ALJ as to the interim recommended order and decision and not to the recommended order and decision as is required under section 8—107(A) of the Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(A)), the objections were not preserved for review).

On July 8, 1988, B&W filed a motion with the Human Rights Commission to modify its order, alleging that an earlier action entitled *Equal Employment Opportunity Comm'n v. Babcock & Wilcox Co.* (W.D. Mo. filed June 13, 1986), No. 86—0762—CV—W—6, superseded this action insofar as the salaried employees are concerned. The record discloses that in that case, the Federal Equal Employment Opportunity Commission filed a complaint on behalf of certain unnamed salaried employees alleging that B&W had violated the Federal Age Discrimination in Employment Act of 1967 (29 U.S.C. §621 *et seq.* (1982)) by denying those employees a termination allowance. That case was settled by a consent decree entered on December 8, 1987. In its memorandum in support of its motion to modify the Commission's order in this case, B&W argued that upon the commencement of an action under the Federal Age Discrimination Act, any State action is superseded, and that any action on behalf of the salaried employees in this case was accordingly precluded. The Commission and the Department note in their brief that on January 6, 1989, the Commission entered a supplemental order, which is not part of the record of this case on appeal, deleting its order for severance payments to the three complainants who were salaried employees, and that a motion by the Department to vacate or modify that supplemental order is still pending before the Commission. The Commission and the Department also

note in their brief in this court that the Department had filed a brief with the Commission in opposition to B&W's motion to modify its order in December 1988, and state that the brief "was inadvertently not before the Commission at the time of the January, 1989 modification. *** The State Respondents will inform this Court of any ruling and make a motion to supplement the record, if necessary." This matter has not been noted or addressed in B&W's brief.

On August 1, 1988, B&W filed a petition for review of the Commission's order by this court pursuant to section 8—111 of the Human Rights Act, which permits a party to obtain judicial review of a final order of the Commission by filing a petition for review in the appellate court within 35 days after entry of the Commission's order. (See Ill. Rev. Stat. 1987, ch. 68, par. 8—111.) The parties have not appealed to this court from the later supplemental order which was apparently entered by the Commission which is stated to have modified the decision relating to the salaried employees and which we are asked to review in this appeal. We note too that B&W has not complied with Supreme Court Rule 341(e)(4)(ii), which requires that an appellant's brief contain a statement of jurisdiction (122 Ill. 2d R. 341(e)(4)(ii)).

■ We consider first whether the Commission's order affirming the ALJ's recommended order and decision is final and appealable. Section 8—111(A)(1) of the Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(1)) provides that a petition for review to the appellate court should be filed in accordance with Supreme Court Rule 335 (107 Ill. 2d R. 335), which makes section 3—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 3—101) applicable to a direct review of an administrative order by the appellate court. (107 Ill. 2d R. 335.) Section 3—101 of the Code of Civil Procedure provides:

" 'Administrative decision' or 'decision' means any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and which terminates the proceedings before the administrative agency. In all cases in which a statute or a rule of the administrative agency requires or permits an application for a rehearing or other method of administrative review to be filed within a specified time (as distinguished from a statute which permits the application for rehearing or administrative review to be filed at any time before judgment by the administrative agency against the applicant or within a specified time after the entry of such judgment), and an application

for such rehearing or review is made, no administrative decision of such agency shall be final as to the party applying therefor until such rehearing or review is had or denied. *However, if the particular statute permits an application for rehearing or other method of administrative review to be filed with the administrative agency for an indefinite period of time after the administrative decision has been rendered* (such as permitting such application to be filed at any time before judgment by the administrative agency against the applicant or within a specified time after the entry of such judgment), *then the authorization for the filing of such application for rehearing or review shall not postpone the time when the administrative decision as to which such application shall be filed would otherwise become final, but the filing of the application for rehearing or review with the administrative agency in this type of case shall constitute the commencement of a new proceeding before such agency, and the decision rendered in order to dispose of such rehearing or other review proceeding shall constitute a new and independent administrative decision.* If such new and independent decision consists merely of the denial of the application for rehearing or other method of administrative review, the record upon judicial review of such decision shall be limited to the application for rehearing or other review and the order or decision denying such application and shall not include the record of proceedings had before the rendering of the administrative decision as to which the application for rehearing or other administrative review shall have been filed unless the suit for judicial review is commenced within the time in which it would be authorized by this Act to have been commenced if no application for rehearing or other method of administrative review had been filed. On the other hand, if the rehearing or other administrative review is granted by the administrative agency, then the record on judicial review of the resulting administrative decision rendered pursuant to the rehearing or other administrative review may consist not only of the record of proceedings had before the administrative agency in such rehearing or other administrative review proceedings, but also of the record of proceedings had before such administrative agency prior to its rendering of the administrative decision as to which the rehearing or other administrative review shall have been granted." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 110, par. 3—101.)

The Human Rights Act does contain provisions which regulate applications for rehearing and modification of the Commission's orders. Section 8—107(F)(1) provides that a party may file an application for a rehearing before the full Commission within 30 days after service of the Commission's order. (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(F)(1).) While applications for a rehearing are discouraged, a rehearing will be granted upon a clear demonstration that legal issues of significance are involved or if there is a conflict in decisions of the Human Rights Commission. (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(F)(2).) If an application for rehearing is granted by a vote of six Commission members, the original order is nullified (Ill. Rev. Stat. 1987, ch. 68, pars. 8—107(F)(2), (F)(3)). B&W did not request a rehearing before the full Commission, but moved for a modification of the Commission's order because, as B&W alleged, a prior consent decree pertaining to the salaried employees had been entered into between B&W and the Equal Employment Opportunity Commission thereby superseding the salaried employees' claims in this case.

■ Section 8—107(G)(1) of the Human Rights Act provides that "[a]t any time prior to a final order of the court in a proceeding for judicial review under this Act, the Commission or the three-member panel which decided the matter, upon reasonable notice, may modify or set aside in whole or in part any finding or order made by it in accordance with this Section." (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(G)(1).) Because the Human Rights Act permits the Commission to modify or set aside its order for an indefinite period of time prior to any final order by a reviewing court, the Commission's order entered on June 28, 1988, must be considered as a final order under section 3—101 of the Code of Civil Procedure, even though it may be modified or, indeed, vacated by the Commission while being reviewed by the appellate or supreme courts.

We recognize that our conclusion that the order is appealable may provide ground for a subsequent mootness argument, as the Commission may have again changed, or vacated, the order we are called upon to review. However, when reviewing a provision under the Fair Employment Practices Act (Ill. Rev. Stat. 1963, ch. 48, par. 858(h)), which is substantially similar to section 8—107(G)(1) of the Human Rights Act, our supreme court stated that "this provision expresses the legislative purpose that judicial review is not to be barred by the power of an administrative agency to reconsider its decision after judicial review has been initiated." (*Motorola, Inc. v. Illinois Fair Employment Practices Comm'n* (1966), 34 Ill. 2d 266, 272, 215 N.E.2d 286, 290.) On addressing the constitutional issue relating to the lack

of complete finality of the administrative decision in that case, the court stated that one constitutional issue that might have arisen "is met by section 9 of article VI of the constitution which provides that the circuit court shall have 'such powers of review of administrative action as may be provided by law.' " (*Motorola, Inc. v. Illinois Fair Employment Practices Comm'n* (1966), 34 Ill. 2d 266, 272-73, 215 N.E.2d 286, 290, quoting Ill. Const. 1870, art. VI, §9; see also *Fredman Brothers Furniture Co. v. Department of Revenue* (1985), 109 Ill. 2d 202, 214, 486 N.E.2d 893; *Woodward Governor Co. v. Human Rights Comm'n* (1985), 139 Ill. App. 3d 853, 857-58, 487 N.E.2d 653.) In light of these cases and section 3—101 of the Code of Civil Procedure, we consider that the Commission's order is final for purposes of review, and any supplemental order entered by it in this case is to be considered as a new and independent decision which has not been appealed and is not before us.

B&W contends first that determining ineligibility for a termination allowance because a former employee is eligible for retirement benefits did not constitute impermissible age discrimination because years of service, and not age, was the determinative factor. B&W also contends that its severance-pay policies are exempt from the prohibitions of the Human Rights Act because the policies are part of a retirement system that is not used as a subterfuge for or does not have the effect of unlawful discrimination. (See Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a).) The Department and Commission argue that because age was a motivating factor in B&W's decision not to pay severance pay to complainants, B&W's severance-pay policies are discriminatory on the basis of age. They also argue that the severance policies in question cannot qualify as an exempt retirement system under section 2—104(5)(a) of the Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a)) or, alternatively, that the policies have the effect of unlawful discrimination because a common element in an exempt retirement plan is the existence of age-related cost factors which are lacking in B&W's severance-pay policies. The argument is that age-based distinctions in retirement systems are permissible only if the cost of providing a benefit increases because of age; thus, because the cost of providing severance pay in the present case does not increase because of the employee's age, B&W's severance-pay policies are not exempt under section 2—104(5)(a) of the Human Rights Act.

We recognize that most Federal authority which has considered a similar Federal statute supports the view of the Commission and Department. (See *Equal Employment Opportunity Comm'n v. Westinghouse Electric Corp.* (3d Cir. 1989), 869 F.2d 696, 710; *Equal Em-*

*ployment Opportunity Comm'n v. City of Mt. Lebanon* (3d Cir. 1988), 842 F.2d 1480, 1489; *Karlen v. City Colleges of Chicago* (7th Cir. 1988), 837 F.2d 314, 319; *Cipriano v. Board of Education* (2d Cir. 1986), 785 F.2d 51, 57-58; *Equal Employment Opportunity Comm'n v. Babcock & Wilcox Co.* (E.D. N.C. 1987), 43 Fair Empl. Prac. Cases (BNA) 736, 742.) However, after oral arguments in this case, the United States Supreme Court decided *Public Employees Retirement System of Ohio v. Betts*, (1989), 492 U.S. ___, 106 L. Ed. 2d 134, 109 S. Ct. 2854, and there considered provisions of the Age Discrimination in Employment Act of 1967 (Age Discrimination Act) (29 U.S.C. §621 *et seq.* (1982)), which are comparable to those of the Illinois Human Rights Act which are the subject of the present appeal. Because most of the decisions in the cases cited by the parties in their briefs are contrary to the holding and reasoning in *Betts*, and we find *Betts* controlling in this case, our analysis will be essentially limited to consideration of *Betts* and the application of its reasoning to this case.

■ A proper resolution of the parties' arguments requires us to first consider whether the Federal Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. §1001 *et seq.* (1982)) preempts the Illinois Human Rights Act insofar as it may vary from the Federal Age Discrimination in Employment Act of 1967, which we do so conclude. ERISA preempts "any and all State laws insofar as they *** relate to an employee benefit plan." (29 U.S.C. §1144(a) (1982).) An employee benefit plan includes an employee welfare benefit plan (29 U.S.C. §1002(3) (1982)) which is "any plan, fund, or program *** established or maintained by an employer or by an employee organization, or by both." (29 U.S.C. §1002(1) (1982).) An employee welfare benefit plan which pays severance benefits out of an employer's general assets as well as a trust fund is governed by ERISA. (*Fort Halifax Packing Co. v. Coyne* (1987), 482 U.S. 1, 7 n.5, 96 L. Ed. 2d 1, 8 n.5, 107 S. Ct. 2211, 2215 n.5.) "State law" includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." (29 U.S.C. §1144(c) (1982).) State decisional law relating to an employee benefit plan is also superseded. *Gadsby v. Health Insurance Administration, Inc.* (1988), 168 Ill. App. 3d 460, 466, 522 N.E.2d 865.

A law "relates to" an employee benefit plan if it has a connection with or reference to such a plan. (*Shaw v. Delta Air Lines, Inc.* (1983), 463 U.S. 85, 96-97, 77 L. Ed. 2d 490, 501, 103 S. Ct. 2890, 2899-900.) In enacting ERISA, Congress did not limit the preemptive effect of ERISA to specific subject matters covered by it which deal with reporting, disclosure, and fiduciary responsibilities. (*Shaw*, 463

U.S. at 98, 77 L. Ed. 2d at 501-02, 103 S. Ct. at 2900.) Instead, Congress intended to eliminate all "conflicting or inconsistent State and local regulation of employee benefit plans." (*Shaw*, 463 U.S. at 99, 77 L. Ed. 2d at 502, 103 S. Ct. at 2901, quoting 120 Cong. Rec. 29933 (1974).) The *Shaw* Court noted Congress' desire to achieve national uniformity with respect to employee benefit plans through ERISA preemption. *Shaw*, 463 U.S. at 99 n.20, 77 L. Ed. 2d at 502-03 n.20, 103 S. Ct. at 2901 n.20.

■ Here, we conclude that B&W's severance-pay policies are employee welfare benefit plans within the meaning of ERISA. Regarding the salaried complainants in this case, the Illinois Supreme Court has considered B&W's policy and procedure No. 1414—A1, with which we are concerned in this case, and concluded that it was an employee welfare benefit plan within the meaning of ERISA. *Arnold v. Babcock & Wilcox Co.* (1988), 123 Ill. 2d 67, 72, 525 N.E.2d 59.

The severance-pay provision in the plant closing agreement executed on behalf of the hourly complainants presents a more difficult question. ERISA preempts State laws which relate to employee benefit plans (29 U.S.C. §1144(a) (1982)), not merely those State laws relating to employee benefits. (*Fort Halifax Packing Co. v. Coyne* (1987), 482 U.S. 1, 7, 96 L. Ed. 2d 1, 9, 107 S. Ct. 2211, 2215-16.) Superficially, *Fort Halifax Packing Co.* appears to apply here. In that case, the defendant closed down its Maine operations but denied the plaintiffs severance pay. Maine had adopted a statute which required employers that terminated their plant operations to pay severance benefits to their terminated employees. The Maine Supreme Judicial Court held that the statute was not preempted by ERISA because ERISA only preempted benefit plans created by employers. Accordingly, the Maine Judicial Supreme Court found that because the severance-pay liability in that case arose from operation of a State statute, the plaintiffs' claim for severance pay was not preempted by ERISA. *Fort Halifax Packing Co.*, 482 U.S. at 4-6, 96 L. Ed. 2d at 7-8, 107 S. Ct. at 2214-15.

While the United States Supreme Court held that the Maine statute was not preempted by ERISA, it disagreed with the State court's rationale. The United States Supreme Court concluded that ERISA did not preempt the statute because it "neither establishes, nor requires an employer to maintain, an employee welfare benefit 'plan' under that federal statute [ERISA]." (*Fort Halifax Packing Co.*, 482 U.S. at 6, 96 L. Ed 2d at 8, 107 S. Ct. at 2215.) The Court stated that in enacting ERISA, Congress intended to provide employers with a uniform set of administrative procedures governed by one set of

regulations. Congress' concern for uniformity in the regulation of employee benefit plans "only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." (*Fort Halifax Packing Co.*, 482 U.S. at 11, 96 L. Ed. 2d at 11, 107 S. Ct. at 2217.) The requirement of a one-time, lump-sum payment triggered by a plant closing requires no administrative scheme at all. (*Fort Halifax Packing Co.*, 482 U.S. at 12, 96 L. Ed. 2d at 12, 107 S. Ct. at 2218.) The Court noted that the defendant had no need to set up an administrative scheme in response to the Maine statute. (*Fort Halifax Packing Co.*, 482 U.S. at 14, 96 L. Ed. 2d at 13, 107 S. Ct. at 2219.) "The obligation imposed by Maine generates no such [administrative] activity. There is no occasion to determine whether a 'plan' is 'operated' in the interest of its beneficiaries, because nothing is 'operated.' " *Fort Halifax Packing Co.*, 482 U.S. at 16, 96 L. Ed. 2d at 14, 107 S. Ct. at 2220.

We find the facts in the present case to be distinguishable. In our view, the hourly complainants in this case were entitled to severance benefits pursuant to an employee welfare benefit plan when B&W entered into its contract with UAW and the Union to provide such benefits. Unlike the facts in *Fort Halifax Packing Co.*, B&W did establish, maintain, and operate an employee welfare benefit plan relating to severance benefits, albeit in anticipation of its plant closure. In *Fort Halifax Packing Co.*, only a Maine statute was involved and did not require employers to design an administrative scheme for payment of severance benefits. Accordingly, we do not find that case controlling, and we conclude that B&W's agreement to pay severance benefits to hourly employees is subject to ERISA.

While ERISA preempts State laws which relate to employee benefit plans (29 U.S.C. §1144(a) (1982)), it does not "alter, amend, modify, invalidate, impair, or supersede any law of the United States *** or any rule or regulations issued under any such law" (29 U.S.C. §1144(d) (1982)). In *Shaw v. Delta Air Lines, Inc.* (1983), 463 U.S. 85, 77 L. Ed. 2d 490, 103 S. Ct. 2890, the United States Supreme Court analyzed the relationship between ERISA, Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended (Title VII) (42 U.S.C. §2000e *et seq.* (1982)), and a State law prohibiting discrimination in employee benefit plans on the basis of sex. Based on a New York human rights law, the State court held that a private employer's employee benefit plan which treated pregnancy differently from other nonoccupational disabilities had engaged in sex discrimination. However, shortly before the State court decision, the United States Su-

preme Court ruled that discrimination on the basis of pregnancy was not sex discrimination under Title VII. *Shaw*, 463 U.S. at 88, 77 L. Ed. 2d at 495-96, 103 S. Ct. at 2895.

The Court held that the State law was preempted by ERISA insofar as it prohibited practices which were not unlawful under Federal law. (*Shaw*, 463 U.S. at 108, 77 L. Ed. 2d at 508, 103 S. Ct. at 2906.) While preemption of a State law which sought to enforce Title VII's commands would impair Title VII, State laws that are lawful under Title VII would not impair it. (*Shaw*, 463 U.S. at 101-03, 77 L. Ed. 2d at 503-05, 103 S. Ct. at 2902-03.) The Court noted that it "fail[ed] to see how federal law would be impaired by pre-emption of a state law prohibiting conduct that federal law permitted." *Shaw*, 463 U.S. at 103-04, 77 L. Ed. 2d at 505, 103 S. Ct. at 2903.

The Court rejected the "double saving clause" argument, that is, because ERISA does not preempt Title VII and Title VII does not preempt State fair employment laws, ERISA does not preempt such State laws. "Title VII does not transform state fair employment laws into federal laws that §514(d) [29 U.S.C. §1144(d)] saves from ERISA pre-emption." (*Shaw*, 463 U.S. at 101 n.22, 77 L. Ed. 2d at 503 n.22, 103 S. Ct. at 2901 n.22.) The Court also rejected the argument that preemption of the State's law would impair Title VII because that law encourages States to adopt laws providing greater substantive protection, noting that "[w]e have found no statutory language or legislative history suggesting that the federal interest in state fair employment laws extends any farther than saving such laws from pre-emption by Title VII itself." *Shaw*, 463 U.S. at 103 n.24, 77 L. Ed. 2d at 505 n.24, 103 S. Ct. at 2903 n.24.

While the Age Discrimination Act permits States to perform like functions with regard to discriminatory employment practices because of age (29 U.S.C. §633 (1982)), we have found no authority, legislative or otherwise, which would permit us to conclude that ERISA's broad preemption provision extends any further than saving State laws which advance the Federal interest in prohibiting age discrimination in employment. In fact, with the exception of a statutory waiting period, the Age Discrimination Act permits concurrent State and Federal administrative jurisdiction to expedite the resolution of age discrimination claims. (*Oscar Mayer & Co. v. Evans* (1979), 441 U.S. 750, 757, 60 L. Ed. 2d 609, 616, 99 S. Ct. 2066, 2072.) State laws which were inconsistent with the Age Discrimination Act would, accordingly, cause simultaneous, inconsistent age discrimination claims.

From the forgoing, we conclude that the age discrimination claims in this case under sections 2—102(A) and 2—104(5)(a) of the Illinois

Human Rights Act are preempted by ERISA to the extent the Illinois Human Rights Act differs from the Federal Age Discrimination in Employment Act of 1967. We next consider the substantive provisions of the Human Rights Act and the Age Discrimination Act as they relate to this case.

It is a civil violation under the Illinois Human Rights Act "[f]or any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A).) The Human Rights Act defines "unlawful discrimination," in part, as discrimination against a person because of age. (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(Q).) "Age" is defined, to the extent pertinent here, as "the chronological age of a person who is at least 40 years old." (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(A).) Thus, only persons who are at least 40 years of age are in the protected class. There is no dispute that the claimants here are in the protected class or that B&W is an employer as defined in the Human Rights Act. The Human Rights Act also provides that an employer is not prohibited from "[a]pplying different standards of compensation, or different terms, conditions or privileges of employment pursuant to a merit or retirement system provided that such system or its administration is not used as a subterfuge for or does not have the effect of unlawful discrimination." Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a).

The similar Federal Age Discrimination in Employment Act of 1967 (29 U.S.C. §621 *et seq.* (1982)) provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." (29 U.S.C. §623(a)(1) (1982).) Persons in the protected class also must be at least 40 years of age. (29 U.S.C. §631(b) (1982).) As does the Illinois Human Rights Act, the Age Discrimination Act provides that it is not unlawful for an employer to observe the terms of a "bona fide employee benefit plan such as a retirement *** plan, which is not a subterfuge to evade the purpose of this chapter." (29 U.S.C. §623(f)(2) (1982).) Because of the close similarities between the Age Discrimination Act and the Human Rights Act, and our conclusion that we are constrained in our interpretation of the Human Rights Act by ERISA and the Age Discrimination Act, we consider *Betts* controlling authority in resolving the issues raised in this petition for review.

In *Betts*, the retirement system adopted for employees of the State of Ohio provided for two types of retirement benefits. An employee was eligible for an age-and-service retirement benefit if at least 60 years of age with five years of service credit; if at least 55 years of age with 25 years of service credit; or if the employee had 30 years of service credit. Disability retirement benefits were available to employees with at least five years of service, but only if the employee was under the age of 60 at the time of retirement. At the time of her retirement, the plaintiff in *Betts* was denied disability retirement benefits as she was 61 years old. The plaintiff's age-and-service retirement benefits under the State plan were $158.50 per month but, had she been permitted a disability retirement benefit, she would have received $355 per month. (*Betts*, 492 U.S. at ___, 106 L. Ed. 2d at 144-46, 109 S. Ct. at 2858-59.) The Court concluded that the plaintiff did not establish that the defendant discriminated against her because of age in these circumstances.

Initially, the Supreme Court considered an administrative regulation of the Equal Employment Opportunity Commission which provided that an employee benefit plan which had age-based distinctions would not be considered a subterfuge to evade the purposes of the Age Discrimination Act if age-based reductions in benefits were justified by significant cost considerations. The Court rejected the EEOC's cost-justification rationale because " 'subterfuge' means 'a scheme, plan, stratagem, or artifice of evasion,' which, in the context of section 4(f)(2) [29 U.S.C. §623(f)(2) (1982)], connotes a specific 'intent *** to evade a statutory requirement.' [Citation.] The term thus includes a subjective element that the regulation's objective cost-justification requirement fails to acknowledge." (*Betts*, 492 U.S. at ___, 106 L. Ed. 2d at 150, 109 S. Ct. at 2863.) Furthermore, the cost-justification requirement appeared nowhere in the Age Discrimination Act but originated from an interpretive regulation promulgated by the Department of Labor, and that regulation did not intend to exclude from section 4(f)(2) exemption plans which could not meet a cost-justification requirement. The regulation was only intended as a safe harbor, that is, "a nonexclusive objective test for employers to use in determining whether they could be certain of qualifying for the section 4(f)(2) exemption." *Betts*, 492 U.S. at ___, 106 L. Ed. 2d at 151, 109 S. Ct. at 2863.

■ We too conclude that an employer need not meet a cost-justification requirement to be eligible for the exemption under section 2—104(5)(a) of the Human Rights Act, and reject the contrary conclusion of the administrative law judge and Commission in the present case.

Like the Federal statute, the Human Rights Act does not mandate such a rule. Further support for our conclusion is the fact that an employer's costs which are associated with providing retirement benefits do not always increase with age. *Betts*, 492 U.S. at ___ n.5, 106 L. Ed. 2d at 152 n.5, 109 S. Ct. at 2864 n.5 (in a defined contribution plan an employer's contribution is fixed and an employee will receive a level of benefits dependent on the amount contributed; thus, an employer's cost for making contributions is totally unrelated to an employee's age).

After finding that an exemption for a *bona fide* retirement plan under the Age Discrimination Act did not require an employer to meet a cost-justification requirement, the United States Supreme Court in *Betts* stated that to determine the meaning of the term "subterfuge" in the context of section 4(f)(2) of the Age Discrimination Act, a court must look to the purposes and substantive provisions of that statute. (*Betts*, 492 U.S. at ___, 106 L. Ed. 2d at 153-54, 109 S. Ct. at 2865-66.) The Federal Age Discrimination Act promotes the employment of older persons based upon their ability rather than age. It is designed to preclude employment discrimination because of age, and enables employers and employees to resolve problems arising from the impact of age on employment. (*Betts*, 492 U.S. at ___, 106 L. Ed. 2d at 153, 109 S. Ct. at 2865.) The Age Discrimination Act's primary enforcement provision prohibits an employer from failing or refusing to hire, or discharging a person, or discriminating against him, with respect to compensation, terms, conditions, or privileges of employment, on the basis of age. (*Betts*, 492 U.S. at ___, 106 L. Ed. 2d at 154, 109 S. Ct. at 2866.) The Court stated:

> "The phrase 'compensation, terms, conditions, or privileges of employment' in section 4(a)(1) [29 U.S.C. §623(a) (1982)] can be read to encompass employee benefit plans of the type covered by section 4(f)(2). Such an interpretation, however, would in effect render the section 4(f)(2) exemption nugatory with respect to post-Act plans. Any benefit plan that by its terms mandated discrimination against older workers would also be facially irreconcilable with the prohibitions in section 4(a)(1) and, therefore, with the purposes of the Act itself. It is difficult to see how a plan provision that expressly mandates disparate treatment of older workers in a manner inconsistent with the purposes of the Act could be said not to be a subterfuge to evade those purposes \*\*\*." (*Betts*, 492 U.S. at ___, 106 L. Ed. 2d at 154, 109 S. Ct. at 2866.)

Accordingly, the Supreme Court held that "when an employee seeks

to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some *nonfringe-benefit aspect of the employment relation.*" (Emphasis added.) (*Betts,* 492 U.S. at ___, 106 L. Ed. 2d at 157, 109 S. Ct. at 2868.) While age-based reductions in benefits would generally be justified by any increased costs generated because of an employee's age, an employer could not decrease the wages of all workers and then increase benefits only for younger workers because the employer's action would be viewed as a subterfuge for age discrimination. Under section 4(d) of the Age Discrimination Act (29 U.S.C. §623(d) (1982)), it is unlawful for an employer to discriminate against an employee who has opposed an employer practice prohibited by the Age Discrimination Act or who has participated in age discrimination-related litigation and, if an employer did so, the employer's action would be a subterfuge for unlawful age discrimination. *Betts,* 492 U.S. at ___, 106 L. Ed. 2d at 156, 109 S. Ct. at 2867-68.

■ Given the similarities between the Age Discrimination Act and the Human Rights Act, and the Human Rights Act's similar purpose of encouraging the employment of older workers (*Board of Trustees of Community College District No. 508 v. Human Rights Comm'n* (1981), 88 Ill. 2d 22, 32, 429 N.E.2d 1207), we conclude that a retirement system in Illinois may be considered as a subterfuge for unlawful age discrimination only if the employee proves that the system was intended to discriminate in a nonfringe-benefit aspect of the employment relation, which was not shown here.

We next consider whether B&W's decision not to pay severance pay to those employees who were eligible to receive retirement pension benefits was pursuant to a retirement system and, if so, whether that system had the effect of unlawful discrimination within the meaning of section 2—104(5)(a) of the Human Rights Act (see Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a)). We believe that the phrase "retirement system" must be. construed here in light of the special circumstances which exist in a plant closure case. To "retire" generally means "[t]o terminate employment or service upon reaching retirement age." (Black's Law Dictionary 1183 (5th ed. 1979).) A "system" is an "[o]rderly combination or arrangement, as of particulars, parts, or elements into a whole; especially such combination according to some rational principle." (Black's Law Dictionary 1300 (5th ed. 1979).) B&W's severance-pay policies were undoubtedly part of a "system" in that it sought to provide a source of income to all employees upon ter-

mination of its Rockford, Illinois, operation. The more difficult question is whether that system may be considered as a "retirement system" under section 2—104(5)(a).

 █ It is apparent that these complainants did not retire in the conventional sense of the word; they were in fact terminated from B&W's employ not because of their age but because B&W ceased its operations in Rockford, Illinois. But, both complainants and the other employees who did receive severance benefits were retired in the sense that both groups of employees were terminated from B&W's employ. In our view, B&W's severance policies on its closure constituted a "retirement system" as they were designed to achieve the same result as would a traditional retirement system in the ordinary sense of that term, that is, B&W's severance policies, like a retirement plan, ensured that its employees receive a source of income upon termination from their employment. B&W's retirement policies did not have the effect of unlawful discrimination as all terminated employees received compensation from B&W by means of an age-neutral employer action. Furthermore, there is no evidence that B&W's retirement system was intended to discriminate in a nonfringe aspect of the complainants' employment relation with B&W.

Because of our disposition of this issue, we need not consider B&W's further contention that the claims of those complainants who were hourly employees were waived by the contract entered into on March 22, 1983, between B&W, UAW and the Union.

The summary judgment of the Human Rights Commission is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

WOODWARD, J., concurs.

JUSTICE LINDBERG, dissenting:
I believe a "best-case scenario" for the complainants serves to establish that the severance-pay plan discriminates on the basis of age and, therefore, is facially age discriminatory. Assume that two employees each had 15 years' service with B&W on October 31, 1983, but one was 54 years old and the other 55 years old or older on that date. Under the plan the 54-year-old would receive about $3,000 in severance pay, and within the following year he would begin receiving his pension benefits. The 55-year-old, only because of his age, would receive no severance pay and would receive only his pension benefits.

Because of his age on October 31, 1983, the 55-year-old has been denied about $3,000 in severance pay. This scenario establishes that B&W's severance-pay plan is facially age discriminatory.

The Illinois Human Rights Act provides:

"§1—102. Declaration of Policy. It is the public policy of this State:

(A) *** To secure for all individuals within Illinois the freedom from discrimination because of *** age *** in connection with employment ***." (Ill. Rev. Stat. 1987, ch. 68, par. 1—102(A)).

And:

"(Q) Unlawful Discrimination. 'Unlawful discrimination' means discrimination against a person because of his or her *** age ***." (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(Q)).)

And:

"§2—102. Civil Rights Violations—Employment. It is a civil rights violation:

(A) Employers. For any employer *** to act with respect to *** discharge *** tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A)).)

And:

"§2—104 Exemptions. Nothing contained in this Act shall prohibit:

an employer *** from:

* * *

(5) Merit and Retirement Systems. (a) Applying different standards of compensation, or different terms, conditions or privileges of employment pursuant to a merit or retirement system provided that such system or its administration is not used as a subterfuge for or does not have the effect of unlawful discrimination." Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a).

This statutory scheme makes it clear that in Illinois it is a civil rights violation for an employer to unlawfully discriminate against its employees, and age discrimination constitutes unlawful discrimination. However, an employer may apply different standards of compensation or different terms, conditions or privileges of employment pursuant to a (1) merit or (2) retirement system provided that the system or its administration is not used as (3) a subterfuge for or (4) does not have the effect of unlawful discrimination which, by definition, is discrimination on the basis of age.

The precise question is whether an employer can establish under

the exemption provision of section 2—104(5)(a) of the Illinois Human Rights Act (HRA) a plant closing severance-pay plan which denies severance pay to employees whose age within three length-of-service categories qualifies them to receive their pension benefits. As to Illinois, it would appear we are writing on a clean slate.

I have charted B&W's severance-pay plan for convenience of analysis as follows:

B & W Severance-pay Plan

Length of Service Categories:

I. 15 years or more service:

(a) Employees under age 55 receive *both* the severance pay and their pension (at 55).

(b) Employees *over* age 55 receive no severance pay but *only* their pension.

II. 10 years but not more than 15 years of service:

(a) Employees under age 62 receive *both* the severance pay and their pension (at 62).

(b) Employees age 62 receive no severance pay but *only* their pension.

III. Minimum but not more than 10 years service:

(a) Employees under age 65 receive *both* severance pay and their pension (at 65).

(b) Employees age 65 or older receive no severance pay but *only* their pension.

I conclude that the severance-pay plan does not qualify for exemption under section 2—104(5)(a) of the HRA (Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a)), because it is not a merit or a retirement plan. Even if it could be construed as a merit or a retirement plan, nonetheless, it has the effect of discriminating on the basis of age. See Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a).

The HRA does not define "merit plan," but it would not be unreasonable to assume that any plan with differentials in pay, hours and other terms of employment based upon quality of performance and/or length of service or other considerations would satisfy the definition of "merit plan." Here severance pay is being *denied* on the basis of merit in terms of length of service. Fifty-five- to sixty-one-year-olds with *15 years' service or more*, for example, *are denied* severance pay while 55- to 61-year-olds with *less than 15 years* of service *are given* the severance pay at issue. This phenomenon persists as to each of the three categories of length of service and, thus, disqualifies the severance-pay plan as a "merit plan."

"Retirement plan," while not defined in the HRA, however is de-

fined as "a systematic arrangement established by an employer for guaranteeing an income to employees upon retirement [withdrawal from active service] according to definitely established rules with or without employee contributions but usu. funded." (Webster's Third New International Dictionary 1939 (1986).) "Income" is defined as "a gain or recurrent benefit that is usu. measured in money and for a given period of time, derives from capital, labor or a combination of both." (Webster's Third New International Dictionary 1143 (1986).) While the severance-pay plan is a guarantee for withdrawal from service, it is not "income" in that it is not a gain or recurrent benefit for a given period of time. In fact, it is a one-time, lump-sum award of money and does not satisfy either the dictionary definition of a retirement plan, or the general notion of what constitutes a retirement plan such as the one already in place at B&W.

Regardless, even if the severance-pay plan were to be viewed as one based upon length-of-service merit or retirement, it has the precise effect of discriminating as to age within each of the three length-of-service categories. As such, the severance-pay plan fails to meet the section 2—104(5)(a) exemption of the HRA, and, therefore, it constitutes unlawful discrimination and a civil rights violation under the HRA. Ill. Rev. Stat. 1987, ch. 68, pars. 1—102(A), 1—103(Q), 2—102(A).

Obviously, I do not agree with the majority's reliance on *Public Employees Retirement System of Ohio v. Betts* (1989), 492 U.S. \_\_\_, 106 L. Ed. 2d 134, 109 S. Ct. 2854. The United States Supreme Court held that the retired employee in that case, Betts, did not establish a *prima facie* case of age discrimination. The Court relied heavily on its analysis of Congressional debate to ascertain the legislative intent behind the ADEA and in arriving at its final conclusion. The Court found that Congress intended not to regulate retirement programs, which were not a mere subterfuge to implement age-discriminatory practices, when it enacted the ADEA. *Betts*, 492 U.S. at \_\_\_, 106 L. Ed. 2d at 155-56, 109 S. Ct. at 2867

The *Betts* Court decided that the "30% floor" for disability benefits, which were not available to persons who had attained age 60, was part of Ohio's State-retirement plan and, therefore, did not qualify as a *nonfringe benefit* subject to the ADEA age-discrimination prohibitions. (*Betts*, 492 U.S. at \_\_\_, 106 L. Ed. 2d at 157, 109 S. Ct. 2868.) The Supreme Court said that *Betts* failed to prove that the discriminatory plan provision was intended to serve the purpose of discriminating in some *nonfringe-benefit* aspect of the employment relationship under the Federal Age Discrimination in Employment Act of

1967 (ADEA) (29 U.S.C. §621 *et seq.* (1982)). *Betts,* 492 U.S. at ____, 106 L. Ed. 2d at 157, 109 S. Ct. 2868.

In Illinois, the legislative intent in enacting our statute was quite different. Section 1—102(A) of the HRA, quoted previously, expresses the legislative intent of the HRA which is to secure for all individuals within Illinois freedom from discrimination in employment because of age. (Ill. Rev. Stat. 1987, ch. 68, par. 1—102(A).) In fact, in one of the few cases involving the HRA to come before the final arbiter of Illinois statutes, the Illinois Supreme Court, the court held that the HRA does regulate retirement plans (*Board of Trustees of Community College District No. 508 v. Human Rights Comm'n* (1981), 88 Ill. 2d 22, 26, 429 N.E.2d 1207, 1210) in contrast to the *Betts* Court's conclusion that the ADEA does not regulate retirement plans unless they are a subterfuge. While I do not premise my conclusion that B&W's severance-pay plan is age discriminatory on the fact of the HRA's coverage of retirement plans, the distinction between the two acts is, nonetheless, apparent. Additionally, while the ADEA and the HRA both incorporate the subterfuge standard, the HRA has the additional standard of "does not have the effect of unlawful discrimination." (Ill. Rev. Stat. 1987, ch. 68, par. 2—104(5)(a).) Therefore, I conclude that the *Betts* decision is not persuasive in the resolution of the instant petition for review.

After submitting my draft dissent to the majority, it undertook further analysis and included a more detailed reliance on the Federal Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. §1001 *et seq.* (1982)) and a discussion of *Fort Halifax Packing Co. v. Coyne* (1987), 482 U.S. 1, 96 L. Ed. 2d 1, 107 S. Ct. 2211. Regrettably, I conclude that the majority in the instant case is incorrect when it concludes that the facts of *Fort Halifax* are distinguishable from those in the instant case. The sole basis for the instant majority's distinction would appear to be that because the hourly employee's union agreed to the severance-pay plan "B&W did establish, maintain, and operate an employee welfare benefit plan relating to severance benefits, albeit in anticipation of its plant closure." (*Babcock & Wilcox Co. v. Department of Human Rights* (1989), 189 Ill. App. 3d 827, 841.) I could not disagree more. The action of the union is irrelevant. What could be less of a "plan" to "operate," to paraphrase the Court in *Fort Halifax,* than disbursing a one-time lump sum severance payment? The Court in *Fort Halifax* said:

> "The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan.* The requirement of a one-time, lump-sum payment triggered by a single event

requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

\* \* \*

The foregoing makes clear both why ERISA is concerned with regulating benefit 'plans,' and why the Maine statute does not establish one. Only 'plans' involve administrative activity potentially subject to employer abuse. The obligation imposed by Maine generates no such activity. There is no occasion to determine whether a 'plan' is 'operated' in the interest of its beneficiaries, because nothing is 'operated.' No financial transactions take place that would be listed in an annual report, and no further information regarding the terms of the severance pay obligation is needed because the statute itself makes these terms clear. It would make no sense for pre-emption to clear the way for exclusive federal regulation, for there would be nothing to regulate. Under such circumstances, pre-emption would in no way serve the over-all purpose of ERISA." (Emphasis in original.) (*Fort Halifax Packing Co.*, 482 U.S. at 12, 16, 96 L. Ed. 2d at 11-12, 14, 107 S. Ct. at 2218, 2220.)

It would be hard to draft a more accurate description of the character of B&W's severance-pay plan. On the basis of the United States Supreme Court's rationale in *Fort Halifax*, B&W's severance-pay plan does not qualify as a plan regulated by ERISA, and, therefore, the application of the Illinois Human Rights Act is not preempted by ERISA.

I believe that the decision of the Illinois Human Rights Commission, finding that B&W's severance-pay plan discriminated on the basis of age and thereby violated the HRA, was correct. I would affirm.